**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **COSTA MANOLOPOULOS,** | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 21-3962-KSM** |
| **LOUIS DEJOY, POSTMASTER GENERAL,** et al., | |
| Defendants. | |

## MEMORANDUM

Marston, J.                                                           February 3, 2023

Plaintiff Costa Manolopoulos brings this lawsuit against his former employer, Defendants Louis DeJoy, Postmaster General and the United States Postal Service (collectively, "USPS" or "Defendant"), alleging unlawful termination in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et. seq.* and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623 *et seq*. (Doc. No. 9.)  Manolopoulos asserts claims of discrimination and retaliation due to his disability and request for a reasonable accommodation, in addition to a claim of age discrimination.  Defendant has moved for summary judgment on all claims.  (Doc. Nos. 22, 29).

For the reasons discussed below, Defendant's Motion for Summary Judgment is granted.

## I.    FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to Manolopoulos, the relevant facts are as follows.

### A.    Probationary Employment with USPS

On November 4, 2019, Manolopoulos began working for USPS as a mail carrier, formally titled City Carrier Assistant ("CCA"), in the Morrisville, Pennsylvania Post Office.

(*See* Doc. No. 23 at ¶ 1; Doc. No. 28 at ¶ 1.)  As a new CCA, Manolopoulos was subject to a 90-day probationary period.  (*See* Doc. No. 23 at ¶ 2; Doc. No. 28 at ¶ 2; *see also* Torrente Dep. 53:22–54:10.)  After undergoing some initial training, Manolopoulos began delivering mail and packages out of the Morrisville Post Office.  (*See* Doc. No. 23 at ¶ 3; Doc. No. 28 at ¶ 3; *see also* Torrente Dep. 48:4–53:18.)  The probationary employees at the Morrisville Post Office are overseen primarily by Postal Supervisor Christopher Torrente, who also provides performance evaluations.  (*See id*. at 53:19–54:11; *see also* Doc. No. 23 at ¶¶ 8–9; Doc. No. 28 at ¶¶ 8–9.)  It is customary for probationary employees to receive three evaluations: the first around 30 days, the second around 60 days, and the third around 80 days after they are hired.  (*See* Torrente Dep. 58:23–59:7; Manolopoulos Dep. 48:8–12; *see also* Doc. Nos. 23-3, 23-4.)  At the end of the probationary period, typically by the 80-day mark, Torrente decides whether to retain the employee on behalf of USPS.  (*See* Torrente Dep. 53:22–54:2; Manolopoulos Dep. 47:3–17; *see also* Doc. No. 23-6.)

Manolopoulos received four performance evaluations from three different supervisors— Torrente, Bill Raspanti and Thomas Gamble— during his probationary period.  Raspanti and Gamble conducted the first two evaluations on December 13, 2019, and January 9, 2020, respectively.  (Doc. No. 23-3, USPS00307, USPS00306.)  Torrente conducted the other two evaluations, one undated and one on January 22, 2020.[1]  (*Id.*, USPS00308; Doc. No. 23-4; *see also* Doc. No. 23 at ¶¶ 4, 9; Doc. No. 28 at ¶¶ 4, 9.)

---

[1] Although customary for Torrente to conduct the three performance evaluations, Torrente only did two of Manolopoulos's evaluations.  (*See* Torrente Dep. 58:23–59:7; Manolopoulos Dep. 48:8–12 ("I never had three evaluations.").)  Torrente testified that he couldn't recall why he didn't give Manolopoulos his third evaluation but explained that evaluations get moved around depending on whether the probationary employee is off on a given day.  (*See* Torrente Dep. 59:3–7.)  Here, Manolopoulos received four performance evaluations from three different supervisors.  It is unclear why Manolopoulos received an extra evaluation.

On the December 13, 2019 evaluation, Raspanti wrote on the "Observation of Work Practices" form that Manolopoulos was "walking slowly" and "fingering mail at door." (Doc. No. 23-3, USPS00307.) He also checked "No" in a box that corresponded to the category: "Maintains a steady pace and does not run," and added the comment, "Slow." (*Id*.) On the January 9, 2020 evaluation, Gamble noted that Manolopoulos "was seen driving without a seatbelt," and "is highly unorganized." (*Id*., USPS00306.) Likewise, Torrente marked on the undated evaluation that Manolopoulos's "Work Quantity" was "Unacceptable."[2] (Doc. No. 23-4; *see also* Torrente Dep. 59:23–60:20.) And, on the January 22, 2020 evaluation, Torrente again noted that Manolopoulos's "pace hasn't improved." (Doc. No. 23-3, USPS00308.)

## B.    First Termination in January 2020

On the morning of January 28, 2020, Manolopoulos was in his postal truck stopped at a yield sign when he was hit from behind by another vehicle. (*See* Doc. No. 23 at ¶ 12; Doc. No. 28 at ¶ 12; *see also* Manolopoulos Dep. 37:20–41:11.) He was taken by ambulance to the hospital and released several hours later with a neck brace. (*See* Doc. No. 23 at ¶ 13; Doc. No. 28 at ¶ 13; *see also* Manolopoulos Dep. 41:16–42:8.) After leaving the hospital, Manolopoulos went directly to the Morrisville Post Office. (*See* Doc. No. 23 at ¶ 14; Doc. No. 28 at ¶ 14; *see also* Manolopoulos Dep. 42:9–14.) Manolopoulos informed Torrente and Raspanti that he was injured and that the doctor told him not to work for two days. (*See* Doc. No. 23 at ¶ 15; Doc. No. 28 at ¶ 15; *see also* Manolopoulos Dep. 43:10–45:10.) Manolopoulos also spoke with Torrente and Raspanti about certain medical and workers' compensation forms that needed to be

---

[2] Although Torrente marked the "Work Quantity" category "unacceptable," he included certain examples of satisfactory performance, such as, "Works at a sufficient speed to keep up with the amount of work required by the position," "Accomplishes tasks in an efficient and timely manner," and "Makes productive use of time when completing assignments." (Doc. No. 23-4.)

completed following the accident.  (*See* Manolopoulos Dep. 43:12–45:10; *see generally* Doc.

Nos. 23-8, 23-9, 23-10, 23-11, 23-14, 23-16.)

The following day, January 29, 2020, although Manolopoulos was out of work due to his

injury, he was directed to come into the Post Office.[3]  (Doc No. 23 at ¶ 16, Doc No. 28 at ¶ 16.)

Once Manolopoulos arrived, Torrente informed him that he was being terminated and gave him a

"Notice of Separation," "effective with the close of business on 01/29/2020."  (Doc. No. 23-6;

*see also* Manolopoulos Dep. 47:6–17, Doc No. 23 at ¶ 16, Doc No. 28 at ¶ 16.)  The stated

reason for Manolopoulos's termination was "PERFORMANCE."  (Doc. No. 23-6.; *see also*

Torrente Dep. 63:21–64:9.)

Manolopoulos testified in his deposition that he was upset about his termination and went

the same day to the USPS's Main Branch in Philadelphia to speak with Human Resources.  (*See*

Doc. No. 23 at ¶ 20, Doc. No. 28 at ¶ 28; *see also* Manolopoulos Dep. at 48:8–50:22.)  After he

explained his "situation," the Human Resources' employee said she would "look into" his

termination.  (*Id.*)

Meanwhile, also on January 29, 2020, Gamble generated a "CA-1" workers'

compensation claim for Manolopoulos.  (*See* Doc. No. 23 at ¶ 21; *see also* Doc. No. 23-8.)  The

next day, January 30, Manolopoulos emailed Torrente his completed Department of Labor

("DOL") "C-16" and "C-17" medical forms, which indicated that Manolopoulos suffered a

"cervical strain" neck injury after being "rear-ended by a vehicle."  (*See* Doc. No. 23 at ¶ 22,

Doc. No. 28 at ¶ 22; *see also* Doc. No. 23-9.)

---

[3] Manolopoulos could not recall who called him into work on January 29, 2020.  (*See* Manolopoulos Dep. 45:25–46:3 ("Q: Who called you in?  A: I believe it was Tom Gamble.  It could have been somebody else. It could have been Bill Raspanti.  I'd have to look on my phone record if I still have that.").)

On February 3, 2020, Raspanti emailed Manolopoulos additional Workers' Compensation forms to be completed by Manolopoulos's medical providers. (*See* Doc. No. 23 at ¶ 24; *see also* Doc. No. 23-10.) And, that same day, USPS Human Resources informed Manolopoulos via letter that it had received notice of his injury and that his "CA-1" workers' compensation claim had been processed and forwarded to the DOL Office of Workers' Compensation. (*See* Doc. No. 23 at ¶ 25; *see also* Doc. No. 23-11.) The letter advised that Manolopoulos might be entitled to "continuation of pay" for any medical visits or disability beyond the date of his injury. (Doc. No. 23 at ¶ 26; *see also* Doc. No. 23-11.) It also advised Manolopoulos that it was his responsibility "to ensure medical documentation is provided to this office to substantiate your work absence and any entitlements to [continuation of pay]" and that he was supposed to "report to his regular duty station for a work assignment within any physical limitations, upon being medically released for limited duty." (*See* Doc. No. 23 at ¶¶ 27–28; *see also* Doc. No. 23-11.)

### C.    Meeting with the Morrisville Postmaster

At some point in mid-February 2020, Manolopoulos met with the Morrisville Postmaster and a representative from the local postal carriers' union. (*See* Doc. No. 23 at ¶ 29; Doc. No. 28 at ¶ 29; *see also* Manolopoulos Dep. 50:20–55:7.) The record is unclear how or why this meeting arose, who initiated the meeting, or when this meeting took place.[4] Manolopoulos asserts that he was told by the Postmaster that he would "probably" be reinstated, but that he would need to be "retrained" and placed under "strict surveillance." (*Id*. at 51:18–52:18; Doc. No. 28 at ¶ 30.) Manolopoulos maintains that he was never told to report back to work during

---

[4] Manolopoulos cannot describe how he even came to be in the same room as the Morrisville Postmaster. (*See* Manolopoulos Dep. 51:4–9 ("I believe I went into his office and he had asked me to come in, or somebody had asked me to come in, and I walked in[.]").) Neither the Morrisville Postmaster nor the union representative is identified by name in the record, nor does it appear that either was deposed.

this meeting, that he did not sign or exchange any documents with the Postmaster, and that his impression of his employment status at the conclusion of that meeting was: "Fired.  They never welcomed me back.  They have never given me a piece of paper that says, you know, we would like to take [sic] back—I'm terminated.  I have a piece of paper that says I'm terminated, so I am terminated."  (Manolopoulos Dep. at 54:4–6; 55:8–18.)  By contrast, USPS contends that Manolopoulos's probationary employment was extended by 45 days and that he was formally reinstated by the Postmaster during this meeting.  (*See* Doc. No. 23 at ¶¶ 30–31.)

After meeting with the Postmaster, Manolopoulos never reported to work again.  (*See* Doc. No. 23 at ¶ 32.)  Manolopoulos does not dispute this fact but insists that he "did not report to work at the Post Office because he had been terminated and never received any documentation rescinding the termination."  (Doc. No. 28 at ¶ 32; *see also* Manolopoulos Dep. At 57:11–13 ("Why would I [report to the post office]?  I was terminated.").)

### D.     Events Leading to Second Termination in July 2020

Although Manolopoulos's contends that he remained "fired" following his meeting with the Postmaster,  he does not dispute that on February 25, 2020, he sent Torrente an email with the subject, "Back to Work," explaining that he was cleared by a doctor to return to work on February 26, 2020, but that he was "still fighting the effects of a concussion" and was in "no shape to actually work at the moment."  (Doc. No. 23-13; Doc. No. 23 at ¶ 34.)  In the same email, he also wrote: "I will be contacting HRM [Human Resources] and Office of Federal Comp tomorrow to explain my situation if thats [sic] ok with you. If its [sic] not and you want me to show up to work please let me know."  (Doc. No. 23-13; *see also* Doc. No. 23 at ¶ 35.) Manolopoulos emailed Torrente again the following day and attached a doctor's evaluation that reflected he was diagnosed with a concussive disorder and was "unable to work at this time until

consultation with neurology specialist." (Doc. No. 23-14; Doc. No. 23 at ¶ 36.)  On February 27, Torrente sent an email to Manolopoulos requesting he come into work to discuss his "updated medical," but Manolopoulos did not respond.  (Doc. No. 23-15; Doc. No. 23 at ¶ 37.)  On March 2, Manolopoulos exchanged his last communication with USPS, submitting a physician report from a March 1, 2020 urgent care visit referring him for a neurology consult.  (Doc. No. 23-16; Doc. No. 23 at ¶ 38.)

Manolopoulos remained on USPS's payroll until mid-March 2020.  (*See* Doc. No. 23-17; Doc. No. 23 at ¶ 39.)  By the third week of March 2020, Manolopoulos started a new job as a delivery driver for Amazon.  (*See* Doc. No. 23 at ¶ 40; Doc. No. 28 at ¶ 40; Manolopoulos Dep. at 66:7–19.)

Manolopoulos continued to receive correspondence from USPS throughout 2020, including follow up from USPS's Reasonable Accommodation Committee ("RAC").  (*See* Doc. No. 23 at ¶¶ 41–59; Doc. No. 28 at ¶¶ 41–59; Doc. Nos. 23-24, 23-26.)  On April 30, USPS sent a formal letter to Manolopoulos, mandating that he explain his absence from work and submit any medical information that would substantiate his absence; Manolopoulos did not respond. (*See* Doc. No. 23 at ¶¶ 43–45; Doc. No. 28 at ¶¶ 43–45; Doc. Nos. 23-18, 23-19.)  The letter advised that if Manolopoulos did not return to work within five days of receiving the letter, or otherwise support any lengthy medical absence with appropriate documentation every 30 days, action would be taken to remove him.  (*See* Doc. No. 23 at ¶¶ 43–45; Doc. No. 28 at ¶¶ 43–45; Doc. No. 23-18.)  On May 19, Manolopoulos was advised by letter that he must appear at the Post Office for a pre-disciplinary interview and that failure to report could result in his removal; Manolopoulos did not respond.  (*See* Doc. No. 23 at ¶¶ 46–47; Doc. No. 28 at ¶¶ 46–47; Doc. Nos. 23-19, 23-20.)  On June 17, Manolopoulos was again advised by letter that he must report

to the Post Office for an interview or face removal; Manolopoulos did not respond.  (*See* Doc.

No. 23 at ¶¶ 48–49; Doc. No. 28 at ¶¶ 48–49; Doc. Nos. 23-19, 23-21.)

Finally, Manolopoulos received a voicemail from Gamble on July 30, 2020, informing

him that he was terminated from USPS's employment due to his failure to report to work.  (*See*

Doc. No. 23 at ¶ 50; Doc. No. 28 at ¶ 50; Doc. No. 23-22; *see also* Manolopoulos Dep. 57:18–23

("I did get a phone call, I think it was near the end of June, or end of July, I'm not sure it was one

of those.  It was either June 30th or July 30th, that basically said I was terminated because I

didn't report to work.  I mean, you already terminated [me] and now you're re-terminating me, I

mean come on.").)

### E.    EEOC Complaint

On August 28, 2020, Manolopoulos contacted an Equal Employment Opportunity

("EEO") Counselor.  (Doc. No. 31-3 at ¶ 64; Doc. No. 31-4 (EEO Alternative Dispute

Resolution Specialist's Inquiry Report dated "initial contact with EEO Office" as August 28,

2020).)  Then, on December 2, 2020, Manolopoulos filed an Equal Employment Opportunity

Commission ("EEOC") Complaint alleging age and disability discrimination.  (Doc. No. 23 at ¶

51; Doc. No. 28 at ¶ 51; Doc. No. 23-7, USPS00085.)  Manolopoulos wrote in his EEOC

Complaint that despite informing his supervisors of his injury and need for two days off on

January 28, 2020, Torrente "instructed [him] not to report back to work when [he] was medically

cleared" on January 29, 2020—the very next day.  (Doc. No. 23 at ¶ 18; Doc. No. 28 at ¶ 18;

Doc. No. 23-7, USPS00085.)  Manolopoulos wrote, "I took this to mean that I was suspended."

(Doc. No. 23 at ¶ 19; Doc. No. 28 at ¶ 19; Doc. No. 23-7, USPS00085.)  He then wrote, "On July

30, 2020, I received a message from management that I was terminated for not reporting to

work."  (Doc. No. 23-7, USPS00085.)  In his EEOC Complaint, Manolopoulos only checked the

8

boxes for "age" and "disability" discrimination and did not check the box for "retaliation."[5]
(Doc. No. 23 at ¶¶ 52–53; Doc. No. 28 at ¶¶ 52–53; Doc. No. 23-7, USPS00085.)

## II.      PROCEDURAL HISTORY

Manolopoulos filed this action on September 3, 2021.  (Doc. No. 1.)  The operative
complaint is Plaintiff's first amended complaint, which was filed July 30, 2020.  (Doc. No. 9.)
Plaintiff asserts the following claims: (1) age discrimination (Count I); (2) disability
discrimination and failure to accommodate (Count II); and (3) retaliation (Count III).  (*Id.*)
USPS moves for summary judgment on all claims.  (Doc. Nos. 22, 29.)  Manolopoulos opposes
the motion.  (Doc. No. 28.)

On December 30, 2022, USPS filed a motion for leave to supplement its original motion
for summary judgment, which Plaintiff does not oppose.[6]  (Doc. No. 31.)  On January 3, 2023,
the Court held oral argument.

## III.      STANDARD OF REVIEW

Summary judgment is appropriate when the "pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the movant is entitled to judgment as a matter of
law."  Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48
(1986).  "[A]t the summary judgment stage the judge's function is not himself to weigh the
evidence and determine the truth of the matter but to determine whether there is a genuine issue
for trial."  *Anderson*, 477 U.S. at 249.

---

[5] On March 10, 2021, Manolopoulos submitted an EEOC Investigative Affidavit in support of his claims.
(Doc. No. 28-1.)

[6] At oral argument Plaintiff's counsel confirmed that Plaintiff does not oppose USPS's supplement.
(Draft H'rg Tr. at 3:1–3 (Q: "Okay.  I guess are you opposed to [USPS] supplementing the summary
judgment?  A: No, Your Honor.").)

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted); *see also id.* at 325 ("[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."). After the moving party has met its burden, the nonmoving party is required to "designate specific facts showing that there is a genuine issue for trial." *Id.* at 323 (quotation marks omitted); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." (footnote omitted)).

## IV.   DISCUSSION

We begin with Manolopoulos's age and disability discrimination claims, before addressing his failure to accommodate and retaliation claims.

### A.   *Discrimination Claims*

Manolopoulos asserts that his termination was discriminatory in violation of the Rehabilitation Act and the ADEA. (*See* Doc. No. 9 at 7–9; *see also* Doc. No. 27-1 at 4.) The Rehabilitation Act forbids federal employers from "discriminating against persons with disabilities in matters of hiring, placement, or advancement."[7] *Shiring v. Runyon*, 90 F.3d 827, 830–31 (3d Cir. 1996); *see also* 29 U.S.C. § 701 *et. seq.* The ADEA similarly prohibits

---

[7] The standards for determining liability under the Rehabilitation Act are coextensive with the standards set out under the Americans with Disabilities Act ("ADA"). *See* 29 U.S.C. § 791(f); *see also Antol v. Perry*, 82 F.3d 1291, 1299 (3d Cir. 1996) ("Whether suit is filed under the Rehabilitation Act or under the [ADA], the substantive standards for determining liability are the same.").

employers from discriminating against individuals in hiring, discharge, compensation, terms, conditions, or privileges of employment based on age.  *See* 29 U.S.C. § 623(a)(1).

Claims arising out of the Rehabilitation Act and ADEA are governed by the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007) ("Accordingly, the familiar framework established in *McDonnell Douglas* for Title VII cases is equally applicable to discrimination claims under the Rehabilitation Act."); *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 465 (3d Cir. 2005) (stating that the *McDonnell Douglas* burden shifting framework is used to analyze ADEA claims where there is no direct evidence of discrimination).

Analysis under this framework proceeds in three steps.  *See Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000).  First, the plaintiff must establish a prima facie case of discrimination by a preponderance of the evidence.  *See id.*; *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003).  If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action.  *Shaner*, 204 F.3d at 494 (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802).  Last, "should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination[,]" in other words, "not the real motivation for the unfavorable job action."  *Id.*; *Sarullo*, 352 F.3d at 797.

### 1.    The Prima Facie Case

USPS argues that Plaintiff cannot make out a prima facie case because he fails to show that he was terminated on July 30, 2020 under circumstances giving rise to an inference of

discrimination.[8]  (Doc. No. 22-1 at 16–17.)  And, USPS argues, even if Plaintiff could make a

prima facie case for disparate treatment, Plaintiff cannot show that Defendant's legitimate, non-

discriminatory reason for terminating Plaintiff—his failure to report to work—was pretext for

discrimination.  (*Id.* at 19.)  Plaintiff claims that he has stated a prima facie case and that

Defendant's stated justifications—beginning with performance and ending with job

abandonment—are pretext for age and disability discrimination.

### a.    *Age Discrimination*

First, the Court addresses Manolopoulos's age discrimination claim.  To establish a prima

facie claim of age discrimination under a theory of disparate treatment, Manolopoulos must

demonstrate by a preponderance of the evidence that "(1) [he] was at least forty years old; (2) the

defendant took an adverse employment action against [him]; (3) [he] was qualified for the

position in question; and (4) [he] was ultimately replaced by another employee who was

sufficiently younger to support an inference of discriminatory animus."  *Burton v. Teleflex Inc.*,

707 F.3d 417, 426 (3d Cir. 2013).  As in this case, "[w]hen a plaintiff is not replaced, he or she

can nonetheless satisfy this fourth element by either: (1) introducing evidence of comparators

---

[8] Manolopoulos's EEOC Complaint and Amended Complaint cite his July 30, 2020 termination as the only adverse employment action.  (*See* Doc. No. 9 at ¶ 64; Doc. No. 23-7 at 1.)  USPS moved for summary judgment with the understanding that Manolopoulos was challenging this termination date.  (*See* Doc. No. 31 at 1.)  But in his opposition brief, Manolopoulos appears to argue that his claims derive from his termination on January 29, 2020.  (*See* Doc. No. 27-1 at 10 ("Plaintiff suffered an adverse employment action in that he was terminated, allegedly for performance reasons, on January 29, 2020.").)  Subsequently, USPS argued that Manolopoulos failed to timely exhaust administrative remedies as to any claims arising from his January 29, 2020 termination.  (Doc. No. 31-2 at 4.)  During oral argument, Manolopoulos conceded that his claims arising from the January 29 termination are not viable and are only asserted in furtherance of his pretext argument.  (*See* Draft H'rg Tr. at 35:3–10 ("Q: You conceded January 29th is not an adverse employment action?  A: We conceded that it was not a recoverable adverse employment action.  To claim now that January 29th is [an] adverse action that he's seeking recovery [for] here, it is untimely.  He didn't make the claim in time.").)  Given this concession, the Court finds Manolopoulos's claims arising from the January 29 termination are barred.  To the extent that any of the arguments the parties articulated in their briefing relate to Manolopoulos's January 29, 2020 termination, the Court will construe them as supporting their arguments relating to the July 30, 2020 termination or, if otherwise inapplicable, will consider them moot.

(i.e., similarly situated employees who (a) were not members of the same protected class and (b) were treated more favorably under similar circumstances); or (2) relying on circumstantial evidence that otherwise shows a causal nexus between his membership in a protected class and the adverse employment action." *Bartell v. Cmty. Coll. of Phila.*, No. 2:19-CV-6056, 2022 WL 561493, at *3 (E.D. Pa. Feb. 24, 2022) (cleaned up).

USPS concedes that "Manolopoulos was terminated [on July 30, 2020], which is an adverse employment decision." (Doc. No. 22-1 at 18 (citing *Gavurnik v. Home Props, L.P.*, 227 F. Supp. 3d 410, 416 n.2 (E.D. Pa. 2017)).) There is no dispute that Manolopoulos was 54 years old at the time of these events and was therefore a member of the protected class under the ADEA. (*See* Doc. No. 28 at ¶ 64); *see also O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) (ADEA's protection is "limited to individuals who are at least 40 years of age" (quoting 29 U.S.C. § 631(a))). Additionally, although USPS pleads some facts that demonstrate Manolopoulos's performance as a mail carrier was unsatisfactory (*see* Doc. No. 22-1 at 19), USPS does not argue that Manolopoulos was unqualified for his position. This leaves the fourth element in dispute.

The Court agrees with USPS that, even when viewing the record in the light most favorable to Manolopoulos, he cannot demonstrate a connection between his age and his termination. In his opposition, Manolopoulos merely parrots the general allegations he initially set out in his EEOC Investigative Affidavit. (*See* Doc. No. 27-1 at 10.) He reiterates that "younger individuals were treated more favorably," as they were "not terminated or suspended for their unexcused absences." (*Id*.; *see also* Doc. No. 28-1 at 5 ("I was 54 at the time. I was never late, and I had never missed a day. I performed very well. Younger workers did not get fired—even after missing days or being late. People that were my age were disrespected every

day.  Older employees were talked about in a negative way.  It was a toxic environment, and I

was discriminated against based on my age….").)  But the Court cannot discern, and

Manolopoulos conspicuously fails to identify, any evidence to support his claim that younger

employees were treated differently upon committing the same conduct for which he was

terminated.  *See Dominici v. Reading Hosp./Tower Health*, No. 5:18-CV-04181, 2020 WL

2898658, at *16 (E.D. Pa. June 3, 2020) (explaining that plaintiff could not establish a prima

facie case of age discrimination on summary judgment where she generally alleged that younger

similarly situated employees received different treatment but failed to provide any specific

information as to these comparators); *Hill v. Bethlehem Steel Corp*., 729 F. Supp. 1071, 1075 n.6

(E.D. Pa. 1989), *aff'd*, 902 F.2d 1560 (3d Cir. 1990) (explaining that where a plaintiff alleges

discriminatory termination based on age, the plaintiff must show that younger employees were

retained in the same circumstances); (*see also* Draft Hr'g Tr. 26:1–6 ("The only evidence we

have with regards to desperate [sic] treatment based on age was that older individuals including

[Manolopoulos] were disrespected and discussed in a negative fashion and the younger

individuals who missed days were not terminated or suspended.  We have no specifics.").)

Despite Manolopoulos's claims in both his EEOC Investigative Affidavit and his

Amended Complaint that older employees were "disrespected" and "talked about in a negative

way by management," he does not point to *any* examples of those statements, disputed or

otherwise, in the record.[9]  (Doc. No. 9 at ¶ 45; Doc. No. 28-1 at 5.)  It is well-established that a

---

[9] Manolopoulos referenced these alleged discriminatory comments in his EEOC Investigative Affidavit
and Amended Complaint.  (*See* Doc. Nos. 9, 28-1.)  He claims that during his three months of
employment with USPS, he heard Torrente refer to older employees as "lazy," "incompetent," and
"slow."  (Doc. No. 9 at ¶¶ 46, 48.)  He also contends that Torrente referenced an older employee and
stated: "We need to get rid of him."  (*Id.* at ¶ 47.)  And, Torrente allegedly stated, "We need to get newer
blood in here."  (*Id.* at ¶ 49.)  From the Court's review of the materials submitted by the parties, these
statements were not addressed in either Manolopoulos or Torrente's depositions—at least in the excerpts
that were provided to the Court.  In his response to USPS's "Statement of Undisputed Material Facts,"

party cannot overcome summary judgment by relying upon, or by simply reiterating via affidavit, mere averments contained in the pleadings. *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990). Assuming that these discriminatory comments were, in fact, made, the record is devoid of any evidence connecting these comments to the decision to terminate Manolopoulos. *See Dominici*, 2020 WL 2898658, at *17 (holding that "stray remarks" made temporally remote from date of adverse employment action cannot support an inference of discrimination); *Robinson v. Mondelez Int'l, Inc.*, 228 F. Supp. 3d 448, 455 (E.D. Pa. 2017) (stray comments "made outside of the context of the decision-making process" were insufficient to demonstrate discriminatory intent); *Scott v. Allied Waste Servs. of Bucks-Mont*, No. CIV.A. 10-105, 2010 WL 5257643, at *5 (E.D. Pa. Dec. 23, 2010), *aff'd*, 448 F. App'x 306 (3d Cir. 2011) (explaining that evidence of discriminatory comments by various co-workers and supervisors was insufficient to establish a prima facie case without "evidence tending to link these remarks to the [adverse employment] decision"). Moreover, the Court notes that "a plaintiff's uncorroborated testimony about discriminatory treatment cannot—on its own— demonstrate invidious intent at the summary judgment stage." *Cridland v. Kmart Corp.*, 929 F. Supp. 2d 377, 389–90 (E.D. Pa. 2013) (citing *Solomon v. Soc'y of Auto. Eng'rs*, 41 F. App'x 585, 586 (3d Cir. 2002)).

---

Manolopoulos only makes general reference to these comments. (*See also* Doc. No. 28 at ¶ 65 ("Plaintiff, in his affidavit, presented claims that he performed well, a genuine issue of material fact, that older individuals were disrespected and discussed in a negative fashion, and that younger individuals who missed days or were late were not terminated or suspended in the same fashion as Plaintiff.").) The *single* reference to Plaintiff's age in the record is found in Torrente's deposition, where he was asked, "Did you, at any point, know what Costa's age was?" and he responded: "No." (Torrente Dep. 58:8–10.); *see also Sarullo*, 352 F.3d at 799 (plaintiff could not raise an inference of age discrimination where he could not demonstrate that the decisionmaker had knowledge of his age). Finally, the Court notes that although Manolopoulos attributes these comments to Torrente, Gamble was the decisionmaker who terminated Manolopoulos on July 30, 2020. (*See* Doc. No. 23-22.)

Because Manolopoulos has not identified similarly situated comparators, who were treated more favorably than him, or otherwise put forth evidence giving rise to an inference of age discrimination as to his July 30 termination, he has not established a prima facie case of disparate treatment, and the Court grants summary judgment in favor of Defendant.

### b.    Disability Discrimination

Next, the Court turns to Manolopoulos's disability discrimination claim.  The ADA prohibits an employer from discriminating "against a qualified individual with a disability because of the disability of such individual."  *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 305 (3d Cir. 1999) (quoting 42 U.S.C. § 12112(a)).

"To establish a prima facie case of disability discrimination under the ADA," a plaintiff must demonstrate that: (1) "she is a disabled person within the meaning of the ADA"; (2) "she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer"; and (3) "she has suffered an otherwise adverse employment decision as a result of discrimination."  *Reyer v. Saint Francis Country House*, 243 F. Supp. 3d 573, 591 (E.D. Pa. 2017).  Here, USPS does not dispute the first or second elements.[10]  As to the third element, USPS asserts that Manolopoulos fails to provide any record evidence that his condition was connected to his July 30 termination.  (Doc. No. 22-1 at 17.)  In his Amended Complaint, Manolopoulos alleges that he was "treated worse than others outside of his protected class," because other employees "who did not have a disability were not subjected to termination

---

[10] For purposes of resolving this motion, USPS concedes "the existence of a disability" with respect to Manolopoulos's claims under the Rehabilitation Act (Doc. No. 22-1 at 17, n.1), and as previously noted, the parties agree that the July 30 termination is the only viable adverse employment action, *see supra* n.8.

for performance issues[11] similar to those Plaintiff was alleged to have."  (Doc. No. 9 at 8; *see also* Doc. No. 27-1 at 11–12.)

To support the third element, a plaintiff "must provide evidence that supports a logical inference of causation between the alleged disability and the adverse employment action." *Mengel v. Reading Eagle Co.*, No. CIV.A. 11-6151, 2013 WL 1285477, at *4 (E.D. Pa. Mar. 29, 2013).  "The sole inquiry is whether [the plaintiff] was terminated *because of his disability*." *Campo v. Mid-Atl. Packaging Specialties, LLC*, 564 F. Supp. 3d 362, 380 (E.D. Pa. 2021) (emphasis in original); *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 301 (3d Cir. 2007) ("[T]o make out a claim under the ADA, the plaintiff need only show that intentional discrimination was the but for cause of the allegedly discriminatory action.").

Despite his allegation in the Amended Complaint that non-disabled employees with performance issues were treated more favorably, Manolopoulos fails to identify any such comparators.  (*See* Doc. No. 9 at 8); *see also Campo*, 564 F. Supp. 3d at 382 (plaintiff could not sustain ADA disparate treatment claim where he did not demonstrate that he was treated differently from other similarly situated employees); *Sampson v. Methacton Sch. Dist.*, 88 F. Supp. 3d 422, 440 (E.D. Pa. 2015) (plaintiff failed to make out prima facie case where she could not establish that her employer treated other similarly situated employees differently).  The record is devoid of any evidence that supports Manolopoulos's assertion that similarly situated, non-disabled individuals received different treatment.  In fact, Plaintiff *admits* that this claim lacks evidentiary support.  (*See* Draft H'rg Tr. 31:20–32:1 ("Q: The other issue that I have is

---

[11] USPS cites Manolopoulos's failure to report to work, not his performance issues, as the reason for his July 30 termination.  (*See* Doc. Nos. 23-6, 23-22.)  Technically, the Court's inquiry should be whether other employees who did not have a disability but who *failed to report to work* were treated differently. But here, because Manolopoulos fails to present any evidence connecting his disability to his termination, there is no need to seek out further evidence as it pertains to these comparators.

your claim that your client was discriminated due to his disability because other United States postal service employees who did not have a disability were not subject to termination for performance issues similar to the plaintiff.  Have you any comparators for this?  A: No.").)  In the absence of comparator evidence, Manolopoulos fails to point to any circumstantial evidence that "shows a causal nexus between his membership in a protected class and the adverse employment action."[12] *Jenkins v. Sw. Pennsylvania Hum. Servs., Inc.*, No. CV 2:20-501, 2021 WL 5989112, at *12 (W.D. Pa. Dec. 17, 2021) (cleaned up).

The prima facie burden "is not intended to be onerous" *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995), but the Court cannot accept that a record bare as this—where Plaintiff cannot point to a single piece of evidence that demonstrates his termination was a result of his disability—is sufficient to overcome this burden.  Even when viewing the evidence in the light most favorable to Manolopoulos, his allegations do not demonstrate that he was terminated for any discriminatory reason.  Manolopoulos's claim fails and summary judgment is granted in favor of Defendant.

\* \* \*

---

[12]  In his opposition, Manolopoulos argues that his termination on January 29, 2020 occurred under circumstances that could give rise to an inference of unlawful discrimination, because he informed USPS of his disability and need for medical leave on January 28, 2020 and was dismissed the following day. (*See* Doc. No. 27-11 at 11-12.)  Manolopoulos asserts that this temporal proximity presents a "genuine issue of material fact surrounding causation" in support of his prima facie case.  *Id.* at 11.  But as already explained, *supra* n.8, any claim of discrimination arising out of the adverse employment action on January 29, 2020 is not actionable due to Manolopoulos's failure to timely exhaust the claim.  To the extent Manolopoulos relies on this argument to support his discrimination claim arising out of his July 30, 2020 termination, the Court finds this prolonged period—almost six months after he informed USPS of his disability and need for leave on January 28, 2020—is insufficient to give rise to an inference of discrimination.  *See Hollingsworth v. R. Home Prop. Mgmt., LLC*, 498 F. Supp. 3d 590, 603 (E.D. Pa. 2020) (finding that a three-month gap between when plaintiff made his employer aware of his disability and his termination was not so "unusually suggestive" to support the causation prong of a disparate treatment claim).

Because both of Manolopoulos's discrimination claims fail at the first step of the *McDonnell Douglas* test, the Court need not analyze the remaining elements.  Assuming *arguendo* that Plaintiff could establish a prima facie case for these claims, the Court finds that Defendant is still entitled to summary judgment, as Plaintiff is unable to demonstrate pretext in this case.

### 2.    USPS's Legitimate, Nondiscriminatory Business Reason

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Shaner*, 204 F.3d at 494 (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802).  The defendant's burden at this step is "relatively light" and is satisfied if the employer produces evidence, "which, if taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).  That is, "the defendant need not prove that the articulated reason actually motivated the action." *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003) (internal quotations omitted).  Whether the defendant has met its burden of production is a determination for the court and "involves no assessment of credibility." *Johnson v. Women's Christian All.*, 76 F. Supp. 2d 582, 586 (E.D. Pa. 1999) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 517 (1993) ("The burden-of-production determination necessarily precedes the credibility-assessment stage.")).

USPS asserts that its legitimate, nondiscriminatory reason for Manolopoulos's termination on July 30, 2020 is "job abandonment."  (Doc. No. 22-1 at 19.)  Although Manolopoulos received a Notice of Separation on January 29, 2020, he concedes it is an "undisputed fact" that he was not "actually terminated" on that date.  (*See* Draft Hr'g Tr. 30:4–15

("Q: We started this whole argument where you said you weren't arguing that [January] 29th was the termination date…. A: I think it's clear from the record he wasn't actually terminated on January 29th. Q: You believe this is an undisputed fact? A: Yes, Your Honor.").) The evidence shows that Manolopoulos's employment was extended by USPS and that he continued to be paid through mid-March 2020, until Manolopoulos began employment with Amazon. (*See* Draft H'rg Tr. at 17:24–18:2 ("Q: He is obviously getting a paycheck, which he would not have gotten if he had been officially terminated on January 29th, correct? A: That's correct.").) Further, following his mid-February meeting with the Morrisville Postmaster, Manolopoulos sent an email on February 25, 2020, to his supervisor titled "Back to Work." (Doc. No. 23-13.) In that email, Manolopoulos told Torrente—the same supervisor who had terminated him only a few weeks prior—that despite being medically cleared to return to work, he would not be able to return because he was still feeling unwell. (*See id.*) He also indicated that he would be contacting HR to explain the "situation," and that if "you [Torrente] want me to show up to work please let me know." (*Id.*)

But despite USPS extending Manolopoulos's employment, he never again reported to work. It was only after "Manolopoulos repeatedly failed to show up when instructed to do so, failed to communicate with his supervisors, failed to provide medical evidence to substantiate his continuing absence, and failed to provide evidence of disability for consideration of a 'reasonable accommodation' when requested to do so," that Gamble left Manolopoulos a voicemail on July 30, 2020 explaining that Manolopoulos was being terminated for failing to report to work. (Doc. No. 22-1 at 19 ("It was only after offering Manolopoulos multiple entreaties over many months that the Postal Service finally terminated him.").)

20

The Court concludes that USPS has satisfied its "relatively light" burden in producing a legitimate nondiscriminatory reason for Manolopoulos's termination of July 30, 2020.  *Fuentes*, 32 F.3d at 763.

### 3. Pretext

Once an employer articulates a legitimate reason for the unfavorable employment decision, the burden of production "rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual."  *Id*.  A plaintiff can show pretext, and so defeat a motion for summary judgment, "by *either* (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."  *Decker*, 871 F. Supp. 2d at 429 (quoting *Fuentes*, 32 F.3d at 764) (emphasis in original).  "Evidence undermining an employer's proffered legitimate reasons…must be sufficient to support an inference that the employer did not act for its stated reasons."  *Campo*, 564 F. Supp. 3d at 384 (quoting *Ball v. Einstein Cmty. Health Assocs., Inc.*, 514 F. App'x 196, 199 (3d Cir. 2013)).

Manolopoulos contends that USPS is "constantly shifting reasoning for [his] termination" by asserting "[a] claim of job abandonment after never actually reinstating Plaintiff[.]"  (Doc. No. 27-1 at 11.)  Plaintiff argues that his January 29 termination is "evidence of the pretextual nature of the termination which later occurred in July."[13]  (Draft Hr'g Tr. 2:11–14.)  Moreover,

---

[13] Manolopoulos argues that the issue of pretext is determined based on his subjective belief as to his employment status which he contends is a credibility determination that must be reserved for the jury. (*See* Draft H'rg Tr. 32:23–33:11 ("Q: How is that not a legitimate business reason to terminate him if he doesn't ever comply?  A: It again comes down to whether or not he [Manolopoulos] understood and knew he was actually reinstated … it's very narrow I understand, but it's the credibility determination with regards to plaintiff's belief of whether or not— Q: So you're saying it all goes on his knowledge that he wasn't reinstated?  A: Yes, Your Honor.").)  But Manolopoulos's subjective understanding of his employment status is not material to the Court's determination of whether he was employed by USPS.

Plaintiff contends that USPS was "just using that [February 2020] reinstatement and termination for failure to appear at work and failure to engage in that [reasonable accommodation] process to terminate him later." (*Id.* at 2:19–24; 35:9–10 ("It's circumstantial evidence of the subsequent pretextual nature of the termination.").)

The Court acknowledges that pretext can be demonstrated by pointing out "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action." *Decker*, 871 F. Supp. 2d at 429 (quoting *Fuentes*, 32 F.3d at 764). Manolopoulos has not, however, pointed to an *actual* inconsistency in USPS's proffered reason. It is true that USPS identifies two different reasons for Manolopoulos's termination— but that is because USPS maintains that Manolopoulos was terminated twice. Manolopoulos was dismissed the first time on January 29, 2020 for unsatisfactory performance, but then reinstated and his employment was extended. (*See* Doc. No. 22-1 at 19.) Manolopoulos was then dismissed the second time on July 30, 2020 for job abandonment. (*See id.*) USPS does not offer contradictory reasons for Manolopoulos's termination, nor does it conflate the reason for Manolopoulos's termination on January 29, 2020 with the reason for his termination on July 30, 2020. (*Compare* Doc. No. 23-6 (notice of separation from Manolopoulos's first termination cited performance as the basis for his termination) *with* Doc. No. 23-22 (voicemail transcript of Manolopoulos's second termination explained that Manolopoulos failed to report to work).)

Manolopoulos also contends that his alleged reinstatement after meeting with the Morrisville Postmaster in mid-February 2020 is "nothing more than an ad hoc explanation after the fact," and that he was still "fired" at the end of this meeting. (Doc. No. 27-1 at 8.) But the evidence in the record proves otherwise. The Court is at a loss as to how to interpret the "Back to Work" email sent by Manolopoulos to his supervisor on February 25, 2020 as demonstrating

anything other than Manolopoulos's understanding of his continued employment with USPS. And there is no dispute that USPS continued to reach out to Manolopoulos for several months, sending multiple follow-up emails and letters between February and June 2020, requesting additional information about Manolopoulos's work absence and his updated medical status.  (*See* Doc. Nos. 23-11; 23-15; 23-18; 23-19; 23-20; 23-21.)  USPS confirmed during the hearing that it would not have sent these communications to an individual who was no longer an employee. (*See* Draft H'rg Tr. 14:10–19 (during oral argument USPS noted that, "HR is sending this letter to a person who's an employee in a work status. … You're still our worker; we need to pay you; and you need to substantiate your absence.").)

Manolopoulos remained on USPS's payroll until mid-March 2020, at which point he voluntarily moved on with new employment.  (Manolopoulos Dep. 66:9–15 (testifying that he started working for Amazon by the third week of March 2020).)

Viewing all the facts in the light most favorable to Manolopoulos, the Court finds that Manolopoulos was aware that he was still employed with USPS until mid-March 2020 when he began a new job with Amazon.  Manolopoulos chose to ignore USPS's requests to report back to work or come in to discuss the status of his medical situation.  Manolopoulos cannot argue that the reason for his termination on July 30, 2020—his failure to report to work—was pretextual, when he did not report to work.  It is the plaintiff's burden "to poke such holes in the proffered reason that a reasonable jury could conclude that the defendants' asserted justifications are a coverup." *Moskowitz v. Neshaminy Sch. Dist.*, No. CV 20-5016, 2022 WL 4225398, at *11 (E.D. Pa. Sept. 13, 2022) (citing *St. Mary's Honor Ctr.*, 509 U.S. at 517).  USPS has not wavered in its legitimate, non-discriminatory reason for Manolopoulos's firing on July 30, 2020, and Manolopoulos offers nothing more than his own assumptions of USPS's discriminatory intent to

counter this proffered reason.[14]  *See Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 853–54 (3d Cir. 2016) (bare assertions are insufficient to prove pretext); *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 646 (3d Cir. 2015) (plaintiff's subjective belief that discrimination occurred did not support an inference of discrimination for disparate treatment claim).  Thus, assuming *arguendo* that Manolopoulos carried his burden and established a prima facie case of discrimination, he still would not be able to overcome USPS's legitimate, nondiscriminatory reason for his termination.

### B.      Failure to Accommodate Claim

Next, the Court turns to Manolopoulos's failure to accommodate claim.  Under the Rehabilitation Act, an employer must make "reasonable accommodations to the known physical or mental limitations of the individual unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer."  *Taylor*, 184 F.3d at 306; *see also Shiring*, 90 F.3d at 831–32 (explaining that employers are required to make reasonable accommodations for disabled employees under the Rehabilitation Act).  An employer is required to "initiate an informal, interactive process with the employee in need of accommodation" to determine "the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations."  *Taylor*, 184 F.3d at 311–12.

_____

[14] Manolopoulos also claims that USPS's "alleged attempts after the fact to request additional medical documentation" about his injury demonstrate pretext.  (Doc. No. 27-1 at 8.)  But Manolopoulos acknowledges that this medical documentation was "collected in connection with workers' compensation requirements[.]"  (*Id.*)  Manolopoulos cannot demonstrate that USPS's "after the fact" request of certain medical documents was pretextual, when he simultaneously admits that these documents were required for processing Manolopoulos's workers' compensation claim.  Indeed, as a matter of both common logic and administrative process, these documents necessarily must be submitted to an employer "after" an injury is reported to that employer.  Further, the fact that USPS reached out to Manolopoulos repeatedly to provide medical documentation that substantiated his work absence actually supports USPS's position that Manolopoulos abandoned his job.

To establish a prima facie case for failure to accommodate, the aggrieved employee must show: (1) the employer had adequate notice of the employee's disability; (2) the employee requested an accommodation; (3) the employer failed to make a good faith effort to assist the employee; and (4) the employee "could have been reasonably accommodated but for the employer's lack of good faith." *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246–47 (3d Cir. 2006). "It is well settled in this Circuit that to prevail on a failure-to-accommodate claim the employee must make clear that the employee wants assistance for his or her disability." *Bowman v. St. Luke's Quakertown Hosp.*, No. CIV.A. 12-797, 2012 WL 6527402, at *4 (E.D. Pa. Dec. 13, 2012) (quoting *Taylor*, 184 F.3d at 313). That is, "the employer must know of both the disability *and* the employee's desire for accommodations for that disability." *Id.* (emphasis in original).

Here, USPS does not dispute that Manolopoulos's neck injury constitutes a qualifying disability, nor does it dispute that USPS was aware of the injury. (*See* Doc. No. 22-1 at 17 n.1.) Instead, the parties dispute whether Manolopoulos made any request for a reasonable accommodation.

USPS argues that there is "no record evidence that Manolopoulos made a request for [a] reasonable accommodation." (Doc. No. 22-1 at 16.) Rather, "the undisputed facts demonstrate that of its own accord, the Postal Service tried to engage Manolopoulos in the reasonable accommodation process, and he ignored its requests." (*Id.*) In response, Manolopoulos asserts that he made a request for a reasonable accommodation when he "requested an accommodation in the form of two days' leave from work," following his accident on January 28, 2020.[15] (Doc.

---

[15] USPS disagrees that Manolopoulos's characterization that a request for two days' off constitutes a request for a reasonable accommodation. (*See* Doc. No. 29 at 5 ("To the extent Manolopoulos argues that providing a doctor's note calling for a 2-day absence was a request for a reasonable accommodation, the court should not construe it as such.").) Manolopoulos testified that as a probationary employee, he did

No. 27-1 at 11.)  For the reasons set out below, the Court grants summary judgment in favor of Defendant as to Manolopoulos's failure to accommodate claim.

First, the basis for Plaintiff's failure to accommodate claim is his request for two days of medical leave on January 28, 2020—a request he argues was not granted because he was dismissed on January 29, 2020.  But Manolopoulos's failure to accommodate claim is barred based on Plaintiff's concession that he failed to exhaust administrative remedies as to his January 29, 2020 termination.  (*See* Draft Hr'g Tr. at 3:5–20; 35:3–10 (admitting that Manolopoulos's January 2020 claims are unexhausted).)

Even if the Court addressed this claim on substantive grounds, the Court finds summary judgment for Defendant is warranted.  As we have explained, although Manolopoulos received a Notice of Separation on January 29, 2020, the record demonstrates that Manolopoulos was subsequently reinstated.  (Draft H'rg Tr. 30:11–15.)  On February 3, 2020, Human Resources contacted Manolopoulos to request medical documentation to substantiate his "work absence" and directed that he should report back to work once he was medically cleared.  (Doc. No. 23-11.)  Manolopoulos himself acknowledged he was still employed and expected to return to work once medically cleared when he sent an email to his supervisor titled "Back to Work."  (Doc. No. 23-13.)  Viewing all the facts in the light most favorable to Manolopoulos shows that USPS provided his requested accommodation of two days' medical leave and more—Manolopoulos remained on USPS's payroll through mid-March 2020 when he accepted employment with Amazon.  (*See* Draft H'rg Tr. at 17:24–18:2.)

---

not believe he was eligible to take leave under the FMLA and therefore concedes that he did not make a formal request for leave.  (*See* Manolopoulos Dep. 63:11–22 ("In 90 days you don't get no leave."); Doc. No. 28 at ¶ 33 ("Plaintiff understood that he had not been a Federal employee long enough to take leave.").)  We need not delve further into this question, however, as Manolopoulos's January 2020 claims were not exhausted and are therefore barred from proceeding on summary judgment.

The undisputed facts also show that Manolopoulos never made a request for a reasonable accommodation beyond his request for two days' leave on January 28, 2020.  Indeed, Manolopoulos does not argue that he made a request for accommodation at any other time.  (*See* Doc. No. 27-1 at 11.)  He *admits* that he did not respond to any correspondence from USPS following his meeting with the Morrisville Postmaster in mid-February 2020.  (*See* Doc. No. 23 at ¶ 32.)  On February 27, 2020, Torrente sent an email to Manolopoulos requesting that he come into work to discuss his medical needs.  (*See* Doc. No. 23-15.)  On April 30, USPS sent a formal letter to Manolopoulos, requiring him to explain his absence from work and submit any medical information that would substantiate his absence.  (*See* Doc. Nos. 23-18, 23-19.)  On May 19 and June 17,  he was advised that he must appear at the Post Office for an interview regarding his absence or face removal.  (*See* Doc. Nos. 23-19, 23-20, 23-21.)  Manolopoulos *never* responded to any of these communications.[16]

The Court finds that Manolopoulos cannot, as a matter of law, sustain a failure to accommodate claim.  Accordingly, summary judgment is granted.

### C.    Retaliation Claim

Last, the Court arrives at Manolopoulos's retaliation claim.  As a threshold issue, USPS contends that we cannot consider Manolopoulos's retaliation claim due to procedural defects that occurred at the administrative stage.  (*See* Doc. No. 22-1 at 12.)  USPS asserts that Manolopoulos did not raise the claim in his EEOC Complaint and therefore failed to exhaust this

---

[16] To provide a reasonable accommodation, the employer and employee must engage in an interactive process.  *See Gardner v. SEPTA*, 410 F. Supp. 3d 723, 743 (E.D. Pa. 2019), *aff'd*, 824 F. App'x 100 (3d Cir. 2020) ("The interactive process requires participation from both parties.").  This is because "[e]ach party holds information the other does not have or cannot easily obtain."  *Taylor*, 184 F.3d at 316.  Here, because Manolopoulos admits that he did not answer USPS's multiple attempts to communicate with him regarding his disability status, the Court finds that he, not USPS, failed to engage in an interactive process.  (Doc. No. 28 at ¶ 49.)

claim.[17]  (*See id.*)  The Court agrees that Manolopoulos did not properly exhaust this claim in his EEOC Complaint; therefore, summary judgment is granted as to Manolopoulos's retaliation claim.

It is well-established that "before an aggrieved employee may bring a Rehabilitation Act claim in court against a federal employer, he must file a claim with the EEOC."  *Wilson v. MVM, Inc.*, 475 F.3d 166, 173 (3d Cir. 2007) (cleaned up); *Spence v. Straw*, 54 F.3d 196, 201 (3d Cir. 1995) ("[A] plaintiff must exhaust Title VII remedies before bringing suit under … the Rehabilitation Act.").  This requirement "serves to promote administrative efficiency, respect executive autonomy by allowing an agency the opportunity to correct its own errors, provide courts with the benefit of an agency's expertise, and serve judicial economy by having the agency compile the factual record."  *Wilson*, 475 F.3d at 173 (cleaned up).  Therefore, "a court need not pass upon the merits of a plaintiff's substantive claim until it satisfies itself that the claim is properly before it, including determining whether the plaintiff properly exhausted administrative remedies."  *Id.*

The administrative exhaustion requirement "is tempered by a fairly liberal construction given to EEOC charges."  *Beer v. Advanced Auto Parts, Inc.*, No. 5:19-CV-05939-KSM, 2020 WL 6700408, at *3 (E.D. Pa. Nov. 13, 2020).  Indeed, the Third Circuit has "rejected the view that the EEOC investigation sets an outer limit on the scope of the civil complaint."  *Howze v. Jones & Laughlin Steel Corp.*, 750 F.2d 1208, 1212 (3d Cir. 1984) (citing *Hicks v. ABT Assocs., Inc.*, 572 F.2d 960, 967 (3d Cir. 1978)).  Thus, where a plaintiff has failed to properly exhaust a claim at the administrative level, a district court may consider the claim on its merits if "the acts

---

[17] The Court acknowledges that USPS previously raised this issue in its motion to dismiss.  (*See* Doc. No. 10.)  At that time, the Court explained that "the Government's exhaustion arguments are more appropriately addressed at summary judgment."  (Doc. No. 17.)

alleged in the subsequent [civil] suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." *Antol v. Perry*, 82 F.3d 1291, 1295 (3d Cir. 1996) (quoting *Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir. 1984));[18] *see also Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398–99 (3d Cir. 1976) ("Courts have generally determined that the parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination[.]"). A claim is reasonably expected to grow out of an EEOC charge when "there was a close nexus between the facts supporting the claims raised in the charge and those in the complaint." *Reynolds v. Aria Health*, Civ. No. 12-2954, 2013 WL 2392903, at *4 (E.D. Pa. May 31, 2013).

Both parties cite to a number of district court cases that have previously encountered this scenario, but the Court does not find these examples persuasive, especially given that they arrive at somewhat contradictory results.[19]  Rather, Third Circuit guidance directs the Court to "focus

---

[18] USPS spends considerable effort in its reply brief attacking Plaintiff's citation to *Waiters v. Parsons*, 729 F.2d 233 (3d Cir. 1984), claiming that Plaintiff "misconstrues the applicable case law." (Doc. No. 29 at 2.)  USPS insists that the exhaustion rule articulated in *Waiters* only applies "[w]here discriminatory actions continue after the filing of an EEOC complaint…based on new acts that occur during the pendency of the case." (*Id.* (quoting *Waiters*, 729 F.2d at 237).)  The Third Circuit held in *Waiters* that the plaintiff's suit for retaliation was not barred for failure to exhaust administrative remedies because the plaintiff did not experience retaliation until after the filing of her EEOC complaint, and "the core grievances in the suit filed and the earlier EEOC complaint were the same[.]" *Antol*, 82 F.3d at 1295 (citing *Waiters*, 729 F.2d at 237).  The Third Circuit did not hold, however, that the exhaustion rule applies *only* in that limited factual scenario.

[19] *Compare Chang v. Berryhill*, No. CV 18-2928, 2018 WL 5316351, at *3 (E.D. Pa. Oct. 26, 2018) (retaliation claim was not exhausted where plaintiff failed to check the box for retaliation and wrote facts in her charge that contradicted her retaliation claim); *Dalzell v. Astrue*, No. 2:05CV755, 2008 WL 598307, at *4 (W.D. Pa. Mar. 3, 2008) (retaliation claim was not exhausted where plaintiff failed to check retaliation box and where EEOC did not uncover retaliation in investigation, even though some facts to support plaintiff's claim were in EEOC affidavit); *Watson v. Se. Pa. Transp. Auth.*, No. 96-1002, 1997 WL 560181, at *7 (E.D. Pa. Aug. 28, 1997) (dismissing retaliation claim as unexhausted where the administrative charge "did not use the word retaliation" and plaintiff did not check the box for retaliation), *with Engelke v. Aldie Counseling Ctr., Inc.*, No. CIV.A. 08-3130, 2008 WL 5083110, at *3 (E.D. Pa. Nov. 21, 2008) (retaliation claim was exhausted where plaintiff's EEOC charge contained facts that could support a claim of retaliation, noting plaintiff was "not required to specifically state 'retaliation' or check off a 'retaliation' box in his administrative charges"); *Demshick v. Del. Valley*

on the degree of difference" between Manolopoulos's discrimination claim in his EEOC

Complaint and his current retaliation claim to determine "whether the omitted retaliation claim

could 'reasonably be expected to grow out of the charge of discrimination' such that an EEOC

investigation of discrimination would uncover any evidence of the alleged retaliation." *Giovanni*

*v. Bayer Props., LLC*, No. CV 20-2215, 2021 WL 1737136, at *3 (E.D. Pa. May 3, 2021); *see*

*also Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 164 (3d Cir. 2013); *Howze v. Jones &*

*Laughlin Steel Corp.*, 750 F.2d 1208, 1212 (3d Cir. 1984).

     In his EEOC Complaint, Manolopoulos wrote that he was "involved in an automobile

accident while at work" on "January 26, [sic] 2020" and "diagnosed with pain and a

concussion," and the "treating physician placed me on a leave of absence for two (2) days."

(Doc. No. 23-7 at 1.)  He claimed that the following day, Torrente "instructed me not to report

back to work when I was medically cleared.  I took this to mean I was suspended."  (*Id.*)  In the

next sentence, he wrote: "On July 30, 2020, I received a message from management that I was

terminated for not reporting to work."  (*Id.*)  Although these facts formed the basis of

Manolopoulos's disability discrimination charge, the Court is not persuaded that a retaliation

claim is reasonably within the scope of this narrative.  The "degree of difference" between

Manolopoulos's discrimination and retaliation claims is significant.  Manolopoulos did not state

any fact that could be interpreted as engaging in a protected activity, nor did he allege facts that

show an "unusually suggestive" temporal proximity between his injury and his termination—in

---

*Convalescent Homes, Inc.*, No. CIV.A. 05-2251, 2007 WL 1244440, at *11 (E.D. Pa. Apr. 26, 2007)
(retaliation claim was exhausted where "a plain reading" of plaintiff's EEOC narrative revealed facts in
support of claim, even though plaintiff "failed to check off the retaliation box on her initial EEOC
charge"); *Hartwell v. Lifetime Doors, Inc.*, Civ. No. 05–2115, 2006 WL 381685, at *18 (E.D. Pa. Feb. 16,
2006) (retaliation claim was exhausted by facts set out in plaintiff's charge, even where plaintiff failed to
check retaliation box on EEOC form, EEOC did not conduct an investigation into retaliation, and plaintiff
was not "artful" in presentation of claim)..

fact, he stated that he was not dismissed by USPS until six months after he was injured.[20]   We cannot accept that these facts would have apprised the EEOC of a potential retaliation claim, such that it should have been encompassed in its initial investigation.  Because it was not alleged in his original EEOC charge, the Court finds that Manolopoulos's retaliation claim is unexhausted and summary judgment is granted.[21]

## V.    CONCLUSION

For the reasons discussed above, the Court grants USPS's motion for summary judgment as to all claims.  An appropriate Order follows.

---

[20] Manolopoulos's failure to include a retaliation claim in this narrative is "particularly unjustified given that plaintiff was represented by counsel experienced in EEOC matters throughout the administrative proceedings." *Savage v. Temple Univ. of Commonwealth Sys. of Higher Educ.*, No. CV 19-6026-KSM, 2020 WL 3469039, at *4 (E.D. Pa. June 25, 2020) (quoting *Johnson v. Chase Home Fin.*, 309 F. Supp. 2d 667, 672 (E.D. Pa. 2004)).

[21] USPS argues that even if the claim had been properly exhausted, Manolopoulos could not support a prima facie case of retaliation.  (*See* Doc. No. 22-1 at 14.)  A retaliation claim requires a plaintiff to show that "(1) he engaged in protected employee activity; (2) he suffered an adverse employment action; and (3) the adverse action was causally related to the protected activity." *Long v. Spalding Automotive Inc.*, 337 F. Supp. 3d 485, 491 (E.D. Pa. 2018) (citing *Shaner*, 204 F.3d at 500).  USPS argues that Manolopoulos's claim fails at the first prong of this analysis because there is "no record evidence that Manolopoulos made a request for reasonable accommodation," and therefore no evidence that he engaged in a protected activity.  (Doc. No. 22-1 at 15.)  As the Court explained, any claim arising out of Manolopoulos's requested accommodation for two days' leave on January 28, 2020, is unexhausted and therefore barred.  Even if the Court accepted that Manolopoulos's request for two days' leave was actionable, the record demonstrates that his request was granted, and that he never engaged in further discussion with USPS regarding a reasonable accommodation.  Thus, we are compelled to agree with USPS that Manolopoulos cannot demonstrate that he engaged in a protected activity.  But, even if we accepted that Manolopoulos could satisfy the first prong, Manolopoulos would not be able to overcome the third prong of this analysis: causation.  Manolopoulos was not terminated until six months after requesting this leave; this passage of time is not so "unusually suggestive" to give rise to retaliatory motive.  *See Shaner*, 204 F.3d at 505; *see also Shellenberger*, 318 F.3d at 188–89 (holding that ten days was sufficient to establish a causal connection); *Jalil*, 873 F.2d at 708 (holding that two days between discharge and protected activity gave rise to an inference of retaliatory motive).  Thus, even if he could overcome the procedural defects in his retaliation claim, the Court is satisfied that Manolopoulos's claim also lacks the necessary evidentiary support to survive summary judgment.